UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ROBERT VINCENT GOSSE,                   )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )       Civil Action No. 14-14066-LTS
                                        )
CAROLYN COLVIN, Acting                  )
Commissioner of the Social              )
Security Administration,                )
                                        )
            Defendant.                  )
_____)


ORDER ON PLAINTIFF'S MOTION TO REVERSE OR REMAND
AND DEFENDANT'S MOTION TO AFFIRM

November 12, 2015

SOROKIN, J.

        Plaintiff Robert Gosse seeks reversal or remand of the decision by Defendant Carolyn

Colvin, the Acting Commissioner of Social Security ("the Commissioner"), denying Gosse's

claims for Supplemental Security Income and Disability Insurance Benefits.  The Commissioner,

conversely, seeks an order affirming the decision.  Doc. Nos. 18, 26.

        For the reasons set forth below, Gosse's Motion to Reverse or Remand the

Commissioner's decision is DENIED, and the Commissioner's Motion to Affirm her decision is

ALLOWED.

I.      BACKGROUND

        A.      Procedural History

On September 6, 2011, Gosse filed an application for Disability Insurance Benefits ("DIB") and an application for Supplemental Security Income ("SSI").  A.R.[1] at 202, 206. Gosse alleged that he suffered from anxiety disorder, depression, mood disorder, and panic attacks, which limited his ability to work.  Id. at 250.  Gosse was notified in two letters, both dated October 20, 2011, that he was determined not entitled to disability benefits or SSI.  Id. at 145, 148.  On December 1, 2011, Gosse filed a Request for Reconsideration.  Id. at 152.  After a second review of Gosse's medical evidence, the Commissioner upheld the previous decisions. Id. at 153, 156.  On May 15, 2012, Gosse requested a hearing before an Administrative Law Judge ("ALJ").  Id. at 162-63.  Gosse, with counsel, attended the April 2, 2013 hearing.  Id. at 61.  The hearing was before ALJ Paul S. Carter, and included testimony from an impartial vocational expert.  Id. at 61, 93.

B.      Gosse's History

Gosse was 30 years old at the time of the hearing before the ALJ.  Id. at 69.  He was single and did not have any children.  Id. at 70.  He graduated from West Roxbury High School, and testified to being able to read, write, and perform basic math.  Id. at 70-71.  "In the mid-2000's" Gosse enrolled in two classes at Quincy College, completing only one.  Id. at 324.  In 2008, Gosse enrolled in, but subsequently dropped out of, two classes at Bay State School of Technology.  Id.

Gosse's last job was at Whole Foods Supermarkets, where he worked from January 2011 until July 2011.  Id. at 262.  Prior to that job, Gosse worked for Roche Brothers from 2006 until 2009 as a home delivery driver.  Id. at 72, 262.  After leaving Roche Brothers, Gosse collected

---

[1] Citations to "A.R." are to the Administrative Record, Doc. No. 12. Page numbers are those assigned by the agency and appear in the lower right-hand corner of each page.

unemployment for 99 weeks.  Id. at 74.  Gosse worked at Shaws from 2004 until 2006, and at

both Krispy Kreme and Toys "R" Us in 2004.  Id. at 262.  Gosse worked at the Dedham Institute

Bank from 2003 to 2004, the US Postal Service from 2001 to 2002, and Office Max from 2000-

2001.  Id.

Gosse's medical records include the following:

The first recorded instance of Gosse's mental health problems was on June 19, 2006,

before Robert Harris, PA-C.  A.R. at 494.  Gosse complained of "anxiety, not going out, [and

being] in fear of everything."  Id.  Gosse was prescribed Zoloft, among other medication.  Id.

Over the next few years, Gosse started receiving lithium for his depression and saw

Harris and Dr. John Looney, his primary care physician, multiple times.[2]  Id. at 449, 481, 483,

554, 568.  On June 3, 2009, after being in the emergency room, Gosse reportedly told a nurse

that he didn't care whether he lived or died.  Id. at 922.  Gosse said that he was misunderstood,

and that he is not suicidal (and has never been)—he is simply ambivalent.  Id.  He reported being

depressed for years with no change.  Id.

Gosse's next medical visit regarding his mental health occurred on June 14, 2011, where

he presented for a follow-up of suicidal ideations.  Id. at 451.  Harris wrote in a report Dr.

Looney co-signed that Gosse "is doing much better, he has less impuls[e] for suicide, homicide,

he's less angered, sleeping better. . . .  He is still unhappy about his home situation living with

his stepfather who appears to be an alcoholic, he's otherwise feeling well and voices no other

complaints."  Id.

On July 18, 2011, Gosse revisited Harris for an evaluation of his depression, anxiety, and

suicidal ideations.  Id. at 441.  Harris wrote that Gosse "is having a difficult time right now" due

---

[2] Harris and Looney were members of the same practice.

to work, financial, and familial stressors, and has suicidal ideations, but no plans to follow through.  Id.

Four days later, Gosse had lost his job due to a panic attack.  Id. at 443.  At the same time, he was also not getting along well with his father.  Id.  As a result of these stressors, he indicated readiness to seek treatment.  Id.  Dr. Looney wrote that Gosse's "depression [was] getting progressively worse, he is suicidal ideation.  He is hearing voices.  At this time [he] was taken to the emergency room to be evaluated by the crisis team.  Most likely he will be admitted."  Id. at 444.  That same day, Drs. Paganelli and Purcell saw Gosse and noted that his depression was not well controlled.  Id. at 531, 534.  This was due in part to the fact that he had lost his job, didn't know where to live, and didn't feel safe in his pre-hospital environment.  Id.

The next day, Dr. Muhammad Fuad Khan admitted Gosse into Beth Israel Deaconess Medical Center for anxiety, depressed mood, and suicidal thoughts.  Id. at 424, 434, 937.  Dr. Khan noted that Gosse had "lost his job last night, has been unsuccessful at securing housing making it impossible for him to move out of his mother and stepfather's house, lacks social support and has no outpatient psychiatrist."  Id. at 424.  At the time, Gosse had ceased use of Zoloft due to sexual performance issues, and he reported that lithium no longer helped him.  Id. at 431.  While in treatment, he began taking new medication and learned he could move in with his uncle.  Id.  At Gosse's discharge on July 28, 2011, Dr. Khan noted that his mood had improved and that "[a]t d/c, his affect was bright."  Id.  Dr. Khan wrote that Gosse would also receive a referral to begin outpatient psychological care.  Id.

Harris and Dr. Looney reevaluated Gosse on August 11, 2011.  Id. at 445.  Harris wrote that Gosse felt like he needed more individual counseling, rather than group sessions, but that he denied suicidal ideations and seems to be better after living with his uncle.  Id.  On August 22,

4

2011, Gosse presented for a follow-up of his depression.  Id. at 757.  Harris wrote that his

"[a]nxiety is doing much better, he was placed on Seroquel 150 mg with psychiatry, he [is]

sleeping, and it seems to be better, he is more active and productive.  Denies suicidal, homicidal

ideations." Id. Gosse visited the office a week later for a sore throat.  Id. at 759.  Harris wrote

"[p]sychologically he is doing much better, he is on Seroquel which has seemed to stabilize his

mood.  He has no further suicidal, homicidal ideations."  Id.

Gosse began counseling sessions with Betty Whitaker, M.Ed., at the South Bay Mental

Health Center on September 16, 2011.  Id. at 779, 848.  Although he was anxious and depressed,

he was "relieved to be able to talk [with a therapist] one-on-one."  Id.  On September 23, 2011,

Whitaker wrote that Gosse reported feeling better after the previous session.  Id. at 778, 845.

Gosse revisited Harris and Looney on September 26, 2011 for another follow-up.  Id. at

761, 792.  Harris wrote that "[p]sychologically the patient seems to be doing better on Seroquel,

he is sleeping better, still has moments of depression but seems to be coping with it better.  He is

still going to do programs, he sees a psychiatrist every Friday."  Id.  A week later, at therapy,

Gosse reported that he had been feeling better lately.  Id. at 844.

On October 6, 2011, Susan Meyer, N.P., wrote that Gosse was "counselling weekly.

Feels good about the way things are going now.  Had a problem when he was living home with

his step Dad – now is with an Uncle and doing better."  Id. at 782.  Whitaker corroborated on

October 14, 2011, that Gosse was starting to feel pretty good, and appreciates the support.  Id. at

843.

Over the next five months, Whitaker reported that Gosse had good and bad days, but did

not experience suicidal or homicidal ideations.  Id. at 827-841.  During this time, on November

30, 2011, Gosse was also seen by his psychiatrist, Dr. Mary Barkalow, who checked the box on

her form which noted that Gosse was in "a decompensated state, which requires frequent visits and medication changes to prevent hospitalization." Id. at 820. She noted his past stressors and diagnosed him with depression, social anxiety disorder, and paranoia. Id.

On January 30, 2012, Gosse visited Harris, who wrote that Gosse had "[b]een doing okay, he's going to group session, his Seroquel, and temazepam he believes is helping him, still has thoughts of suicide but no plan." Id. at 763.

On March 2, 2012, Valerie Zelonis, BSN, MSN, PMHNP-BC, from the South Bay Mental Health Center, wrote that Gosse started new medication, and that he had depression his entire life but "feels better now." Id. at 810. She noted that he had no thoughts of suicide or homicide. Id.

On March 22, 2012, Whitaker noted that Gosse's anxiety was higher after ongoing challenges with his girlfriend. Id. at 828. The next day, Zelonis reported that Gosse broke up with his girlfriend the previous night, but, although he was anxious and depressed, his sleep was okay and he had no thoughts of suicide or homicide. Id. at 806.

On April 6, 2012, Barkalow diagnosed Gosse with moderate major depression disorder without psychotic features and generalized anxiety disorder. Id. at 879. She noted that Gosse reports that he can neither socialize in public nor use public transportation, and that his anxiety interferes with his ability to be in groups and in public. Id. On April 27, 2012, she again checked the box indicating that Gosse was "in a decompensated state," and wrote that he was paranoid, anxious around other people, and still had difficulty being around people. Id. at 802.

On July 2, 2012, Barkalow filled out a mental residual functional capacity assessment. Id. at 884. She wrote that Gosse displayed markedly limited ability to:

- Understand and follow directions
- Carry out detailed instructions

- Maintain attention and concentration for extended periods
- Work in coordination with or proximity to others without being distracted
- Make simple work-related decisions
- Complete normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods
- The ability to interact appropriately with the general public
- Ask questions and request assistance
- Accept instructions and respond appropriately to criticism from supervisors
- Get along with coworkers or peers without distracting them or exhibiting behavioral extremes
- Respond to changes in work setting
- Set realistic goals or make plans independently of others

Id.

On July 13, 2012, Barkalow again checked the "in a decompensated state" box and wrote that although Gosse was anxious and depressed, he was no longer getting angry and not experiencing suicidal ideations.  Id. at 1043.

On July 22, 2012, Dr. Russell Phillips, PhD, filled out a mental residual functional capacity assessment.  Id. at 887.  He found Gosse only markedly limited in one area: the ability to interact appropriately with the general public.  Id.  Of Dr. Barkalow's assessment, he indicated that because her ratings were based on the claimant's report, he considered them, but did not assess them as treating source opinion.  Id. at 889.  Moreover, Dr. Phillips wrote that "[m]ore consideration is given to the longitudinal treatment records, which consistently assess normal mental status."  Id.

On August 3, 2012, Harris filled out an EADMC medical report.  Id. at 910.  Harris described Gosse's depression, anxiety, and panic attacks, and indicated that Gosse has an impairment affecting his ability to work and it will last for more than a year.  Id.  He noted that Gosse drives, but is anxious if another car pulls up alongside him, and food shops, but is worried about people watching him.  Id.

On October 12, 2012, Gosse entered the psychiatric unit of MetroWest Medical Center complaining of increased depression, increased anxiety, and suicidal ideation with a plan to carry it out. Id. at 1012, 1021.  By Gosse's report, this was in part precipitated by a fight with a bully at a wedding, a break-up with a girlfriend a month ago, and witnessing his current girlfriend trying to overdose. Id. at 1012.  Over the next few days, multiple healthcare professionals assessed Gosse's mood, and he was placed on a new medication.  Four days later, on October 16, 2012, Dr. Vincent Desantis wrote that Gosse "reports a significant decrease in paranoia and anxiety and improvement in his mood.  He is out of his room much more and is socializing with other patients." Id. at 1020.  At his discharge on October 18, 2012, Dr. Desantis wrote that "[p]sychopharmacology consult was carried out and risperidone was suggested as a mood stabilizer and he found this very, very helpful.  As the dose was increased, his anxiety lessened, his paranoia lessened, and his affect became brighter.  At discharge, he was denying suicidal ideation and he was feeling much less depressed." Id. at 1021.

On November 13, 2012, Harris re-evaluated Gosse after his inpatient stay. Id. at 1092. Harris wrote that Gosse "states he had a breakdown, his ex-girlfriend tried to overdose in front of him, he got in an altercation at a wedding, he seems more angry, combative." Id.  Gosse stopped taking Risperdal[3] and Depakote because he thought his face was swelling, but did increase his Seroquel intake. Id.  He denied suicidal and homicidal ideations at the time. Id.

That same day, Harris filled out a mental residual functional capacity assessment. Id. at 918.  Harris wrote that Gosse was markedly limited in the following areas:

- -    The ability to remember locations and work-like procedures
- -    The ability to carry out detailed instructions
- -    The ability to maintain attention and concentration for extended periods

---

[3] Risperdal contains risperidone.

- The ability to work in coordination with or proximity to others without being distracted
- The ability to complete normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods
- The ability to interact appropriately with the general public
- The ability to accept instructions and respond appropriately to criticism from supervisors
- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes
- The ability to respond to changes in work setting

Id.  Harris noted that Gosse continues to have social disorder and paranoia, and extreme anxiety, and is still totally disabled, and not ready for employment.  Id.

On November 14, 2012, Gosse began seeing Bruce Barrett, MA, as his regular therapist. Id. at 1050.  Barrett noted that Gosse denied suicidal or homicidal ideations, but remained anxious.  On January 23, 2013, Barkalow saw Gosse and again checked the box next to "in a decompensated state."  Id. at 1039.

On February 25, 2013, Gosse visited Harris for a follow-up on his depression, paranoia, and anxiety.  Harris noted that Gosse "seems to be doing okay has occasional panic attacks, feels depressed at times, is follow[ed] by psychology/psychiatrist, he states when he sees the psychiatrist at his depression seems to be improved."  Id. at 1094.  Harris noted that Gosse denied suicidal and homicidal ideations.  Id.

On April 17, 2013, Barkalow completed another mental residual functional capacity assessment.  Id. at 1108.  She reported Gosse was markedly limited in the following areas:

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances
- The ability to work in coordination with or proximity to others without being distracted
- The ability to complete normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods
- The ability to interact appropriately with the general public

9

- The ability to ask simple questions or request assistance
- The ability to accept instructions and respond appropriately to criticism from supervisors
- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes
- The ability to set realistic goals or make plans independently of others

Id.  Specifically, Barkalow wrote that Gosse suffered from major depression disorder—recurrent severe without psychotic features.  Id.  He also suffered from bipolar disorder and PTSD, and she emphasized his difficulty in interacting with others without engaging in altercations or getting emotionally overwhelmed.  Id. at 1110.

F.    Gosse's Hearing

Gosse attended the hearing before the ALJ with counsel on April 2, 2013.  Id. at 63. During the hearing, the ALJ noted that Dr. Barkalow's first assessment was troubling because she couched the assessment as provided by the patient, rather than her opinion.  Id. at 67-68.  The ALJ was also uncomfortable with Harris and Dr. Looney's assessments of Gosse's depression because their discussion of it was only in the context of a physical examination, and they were not mental health specialists.  Id. at 68.  The ALJ then requested to have up-to-date records from Dr. Barkalow, which he considered potentially more valuable.  Id. at 68-69.

The ALJ asked Gosse about his work, medical, and educational history.  Id. at 69-75. Next, the ALJ asked Gosse about his current treatment and social activities.  Id. at 76-90.  During the hearing, Gosse testified that he saw Dr. Barkalow every few months.  Id. at 77.  The first time that Gosse saw her, he testified that they met for an hour.  Id. at 79.  Subsequently, their sessions ran about 10 minutes.  Id.

The ALJ then posed a hypothetical question to the vocational expert regarding the employability of an individual who

is currently 30 years of age.  He has a high school education, a full ability to read, and write.  And understand what he reads and writes.  He can certainly understand posted signs and warnings.  He would keep and maintain a list, a sign in sheet, even though he has the knowledge to understand and provide written instructions. . . . He has a full ability to perform mathematical functions.  He worked at a bank, as a teller.  So he can take money, he can make change.  He has the past relevant work that you've identified.  He has the ability to perform work at all exertional levels. He has non-exertional limitations based on accommodation for anxiety.  It's been identified as depression, mostly identified as a dysthymic condition, but considered depression.  There is some marijuana use.  The combination of his anxiety and his depression will at times have a moderate [e]ffect on his ability to concentrate; to remember; to attend to tasks; to follow instructions; and to conform to changes in work environment.  As a result of that, he would compensate by limiting himself to performing simple repetitive tasks.  He is not capable of performing complex tasks with a moderate deficit at times of concentration, attention, following instructions. He is able to work with or without supervision.  Because of his anxiety disorder, he is limited in his ability to deal with coworkers.  There should be no tandem work. I'd define tandem work as a job where it requires more than one person to complete a process at a particular time.  If he's not working in tandem with other workers, he can be in the same building, the same facility, the same room. And have just casual contact with coworkers.  His problems with dealing with the public are the result of anxiety, and depression, and its combination.  I'm going to limit him in his ability to deal with the public.  As I mentioned, even though he has the full ability to read, and to write, and understand what he reads and writes.  He is not capable of having contact with the public where he would need to provide or receive instructions.  Be they in writing or orally, or provide instructions as part of a job description.  If he is limited in terms of his contact with the public, the simply basic, momentary, casual contact only, such as taking tickets; checking off names; making change, provided that he does not have to provide or receive instructions or information; such casual contact would be appropriate and allow him to perform at an average amount of stress.

Id. at 95-97.  The vocational expert testified that such an individual would be able to

perform Gosse's past work as a stocker, and other jobs, such as cleaner, dishwasher, and

janitor, as well.  Id. at 83.

The ALJ then asked the vocational expert about missing time at work due to

anxiety or depression.  Id. at 98-100.  The vocational expert testified that if anxiety,

depression, or their combination were to distract an employee more than 5% of the time

during two hours of work, and that became a pattern, it would preclude employment.  Id.

at 100.  Similarly, if the employee would require longer than the two 15-minute breaks or

30-minute lunch break, and that became a pattern, it would also preclude employment.

Id.

     H.      <u>The Administrative Decision</u>

The ALJ first noted that he accepted the April 17, 2013 assessment from Dr. Barkalow

into evidence and considered that in his decision.  <u>Id.</u> at 46.  The ALJ then conducted the

standard five-step sequential evaluation process that determines whether an individual is

disabled, and therefore entitled to benefits.  <u>Id.</u> at 47-48.[4]  The ALJ found at step one that Gosse

had not engaged in substantial gainful activity since July 22, 2011.  <u>Id.</u> at 48.

At the second step, the ALJ looked to determine whether or not Gosse had a "severe

impairment" which "significantly limits [his] physical or mental capacity to perform basic work-

related functions."  <u>Goodermote</u>, 690 F.2d at 6.  The ALJ determined that Gosse suffers from

---

[4] The five steps are:

    First, is the claimant currently employed?  If he is, the claimant is automatically considered not disabled.

    Second, does the claimant have a severe impairment?  A "severe impairment" means an impairment "which significantly limits his or her physical or mental capacity to perform basic work-related functions."  If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

    Third, does the claimant have an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1?  If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled. . . .

    Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past?  If not, he is not disabled.  If so, the agency asks the fifth question.

    Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy?  If so, he is disabled; if not, he is not disabled.

<u>Goodermote v. Sec'y of Health & Human Servs.</u>, 690 F.2d 5, 6-7 (1st Cir. 1982).

"the following severe impairments: major depressive disorder, generalized anxiety disorder, and substance abuse disorder."  A.R. at 49 (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).[5]

At the third step, the ALJ determined whether Gosse has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations.  20 C.F.R. § 404.1520(a)(4)(iii); Goodermote, 690 F.2d at 6.  A claimant is disabled if he has an impairment that both meets or equals one of the impairments listed in Appendix 1, and fulfills the duration requirement.  20 C.F.R. § 404.1520(a)(4)(iii).  The ALJ found that Gosse's severe impairments did not meet, or medically equal, the listed impairments.  A.R. at 49.

The ALJ considered Gosse's Residual Functional Capacity ("RFC") and past relevant work at the fourth step.  20 C.F.R. § 404.1520(a)(4)(iv); Goodermote, 690 F.2d at 7.  An RFC is an individual's ability to do physical and mental work activities on a sustained basis, despite limitations from his impairments.  20 C.F.R. § 404.1545.  When the ALJ determines that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must evaluate the claimant's RFC and then apply the RFC in determining whether the claimant can perform past relevant work.  20 C.F.R. § 404.1520(e).  Here, the ALJ found that Gosse could "perform a full range of work at all exertional levels but with the following nonexertional limitations: [Gosse] would be limited to simple, repetitive tasks… around coworkers, but… [not] requiring tandem work."  A.R. at 51.  Gosse "could tolerate only basic, casual contact with the general public [and] should avoid jobs that require providing information to the general public. [Gosse] would be able to work with or without supervision."  Id.

---

[5] Gosse had a history with marijuana.

The ALJ determined that Gosse's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" because "[t]he objective medical evidence of record supports the residual functional capacity assessment outlined above." Id. at 52. Additionally, the ALJ gave "some weight," instead of controlling weight, to Dr. Barkalow's opinion because "it is inconsistent with other substantial evidence in the case record[,]" Id. at 56, and "there is no reason to suspect that she has any understanding whatsoever of the specific meaning of ['mild,' 'moderate,' and 'marked'] in this particular context." Id. at 56-7.

The ALJ next noted Harris's opinion, and determined that Harris is not an acceptable medical source. Id. at 57 (citing SSR 06-3p, 2006 WL 2329939). Further, the ALJ wrote that "there is no reason to suspect that Mr. Harris is aware of the specific meaning of the words 'mild,' 'moderate,' and 'marked' within the Social Security disability determination process." Id. at 57.

The ALJ determined that Dr. Phillips, a State agency psychological consultant, "is consistent with the record as a whole" and therefore gave his opinion "great weight." Id. The ALJ cautioned, though, that State agency opinions are non-examining sources, and must be weighed as such. Id. (citing SSR 96-6p, 1996 WL 374180). The ALJ explained that "in the absence of other fully credible medical opinions, I have given some weight to the opinions of the State agency consultants involved in the present case, but only to the extent that such opinions are consistent with the evidence of record." Id.

The ALJ next concluded that Gosse "is capable of performing past relevant work as a retail stocker" because "[t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." Id. at 58 (citing 20 C.F.R. §§ 404.1565 and 416.965).

At step five, the ALJ concluded that Gosse is capable of performing four jobs given Gosse's RFC, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v).  It is the ALJ's burden to present "evidence of specific jobs in the national economy that the applicant can still perform."  Seavy v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  In Gosse's case, the ALJ accepted the vocational expert's testimony at the hearing that, given Gosse's limitations, Gosse could perform occupations such as a retail stocker, a home delivery driver, a postal deliverer, and a bank teller.  A.R. at 58.  As a result, the ALJ made a finding that Gosse is "not disabled."  Id. at 60.

 I.  The Appeals Council

On September 9, 2014, the Appeals Council denied Gosse's request for review.  Id. at 1.  Its denial noted that it "looked at the evidence dated August 17, 2012 through March 5, 2014 from Mary Barkalow, MD."  Id.  Nevertheless, it concluded that "this information does not show a reasonable probability that, either alone or when considered with the other evidence of record, would change the outcome of the decision."  Id.

II. STANDARD OF REVIEW

The Court's jurisdiction is limited to reviewing the Administrative Record to determine whether the ALJ applied the proper legal standards and whether the decision is supported by substantial evidence in the record.  42 U.S.C. § 405(g); Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam).  Substantial evidence is such relevant evidence as a reasonable mind, reviewing the evidence in the record as a whole, could accept as adequate to support a conclusion.  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Determinations of credibility and the resolution of conflicts in the evidence

are for the Commissioner and not for the doctors or for courts.  Id.; see Richardson v. Perales,

402 U.S. 389, 399 (1971).

Administrative findings of fact, however, are not conclusive "when derived by ignoring

evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172

F.3d 31, 35 (1st Cir. 1999) (per curiam).  If the Court finds that the Commissioner's decision is

based on legal error or is not supported by substantial evidence, it has the power to modify or

reverse the Commissioner's decision, with or without remanding for rehearing.  42 U.S.C.

§ 405(g).

III.    DISCUSSION

The sole issue on appeal is whether the ALJ erred in affording less-than-controlling

weight to the opinion of Gosse's treating psychiatrist, Dr. Barkalow.  Gosse argues that the

ALJ's determination not to credit Dr. Barkalow's reports was based on unsupported speculation

that Dr. Barkalow did not know the specific meaning of the words "mild," "moderate," and

"marked" within the context of a Social Security benefits application.  Doc. No. 19 at 9-10.

Moreover, Gosse asserts the ALJ erred in not requesting additional information from Dr.

Barkalow, thus failing to confirm his theory.  Id. at 10.

ALJs must give treating source opinions controlling weight unless they are: (1) not well-

supported by medically acceptable clinical and laboratory diagnostic techniques; or (2) are

inconsistent with other substantial evidence in the case record.  20 C.F.R. § 404.1527(c)(2);

accord Arroyo v. Sec'y of HHS, 932 F.2d 82, 89 (1st Cir. 1991) (per curiam) ("[T]his circuit

does not require ALJ's to give greater weight to the opinions of treating physicians.").  The ALJ

may "piece together the relevant medical facts from the findings and opinions of multiple

physicians."  Evangelista v. Sec'y of Health & Human Services, 826 F.2d 136, 144 (1st Cir.

1987).  "If the choice is supported by substantial evidence, the ALJ may prefer the opinion of a reviewing physician to that of a claimant's treating physician." Cooper v. Astrue, No. 10-10782-RGS, 2011 U.S. Dist. LEXIS 32494, at *17 (D. Mass. Mar. 29, 2011).  Thus, the ALJ may "downplay the weight afforded a treating physician's assessment of the nature and severity of an impairment where . . . it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004).  "Regardless of whether or not the administrative law judge decides to discount the treating physician's opinion, the decision 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record.'" Rodriguez v. Astrue, 694 F. Supp. 2d 36, 42 (D. Mass. 2010) (quoting Social Security Rule, SSR 96-2p, 1996 SSR LEXIS 9, at *12).

Because evidence in the record must support the specific reasons, an ALJ may not downplay a treating physician's opinion based on unsupported speculation.  Id. at 43.  Thus, where the ALJ based the decision to downplay the treating physician's opinion on a belief that the treating physician was inclined "to write reports sympathetically aimed at enhancing [Plaintiff's] ability to tap another source of income[,]" the reasoning "was both unsupported and speculative and, hence . . . unavailing." Id.; see also Miles v. Chater, 84 F.3d 1397, 1401 (11th Cir. 1996) (finding that the ALJ's observation that a doctor's examinations for a particular attorney "almost invariably conclude that the person being examined is totally disabled" was rendered "without any evidence in support thereof" and compromised the process).

The Court finds that to the extent the ALJ downplayed Dr. Barkalow's testimony because there was "no reason to suspect that she has any understanding whatsoever of the specific meaning of these terms in this particular context," such speculation was impermissible.  The ALJ

must make determinations of weight based on the record, and there was nothing in the record suggesting Dr. Barkalow meant anything other than what she indicated on the form.  See Social Security Rule, SSR 96-2p, 1996 SSR LEXIS 9, at *12.  Rather, this reason for downplaying the medical evidence was based on the ALJ's concern that the provider did not understand the terms "mild" and "marked" within the context of social security disability law.  That concern, however, in the absence of record evidence, is not a basis for limiting the treating physician's opinion.  See Rodriguez, 694 F. Supp. 2d at 43 (finding that the ALJ's suspicion of the treating physician's motives was an impermissible reason for downplaying the treating physician's opinion).

Nevertheless, when an ALJ relies on an impermissible reason, the "decision can still pass muster if the other reasons given to accord medical reports little weight are adequately supported."  Arroyo v. Barnhart, 295 F. Supp. 2d 214, 221 (D. Mass. 2003).

Here, the ALJ found that "Dr. Barkalow's opinion is not entitled to controlling weight, as it is inconsistent with other substantial evidence in the record."  A.R. at 56.  Specifically, the ALJ found Dr. Barkalow's opinion inconsistent because Gosse had a "conservative and largely effective history of mental health treatment," indicating mild-to-moderate, rather than marked, limitations.  A.R. at 56.  Specifically, the ALJ noted that "[s]uch a history of improved symptoms tends to indicate that – in the setting of appropriate treatment and a stable social environment – the claimant's symptoms were generally amenable to management."  Id. at 54.  Dr. Barkalow, on the other hand, found Gosse markedly limited in twelve and eight areas in the 2012 and 2013 assessments, respectively.  These marked limitations were inconsistent with the ALJ's view that Gosse was only mild to moderately limited, and the ALJ concluded that "[t]o the extent that Dr. Barkalow has set forth a range of mild and moderate mental limitations, I give her

opinion some weight, as such a level of mental limitation is generally consistent with the record as a whole." Id. at 57.

Moreover, one of Dr. Barkalow's submitted evaluations merely reported Gosse's self-assessment, not her own opinions. A.R. 884-886. She prefaced each check-off-the-box answer with the words "Per Client Report." Id. While the final question calls for "[the Doctor's] summary conclusions in narrative form," and asked Dr. Barkalow to "explain conclusions that differ from . . . the individual's allegations," Dr. Barkalow merely stated what "Robert reports" in the course of his therapy sessions. Id. at 886. The ALJ noted his concern with this document at the hearing, and it does not provide evidence of the treating physician's opinion. See id. at 67-68 ("One of the concerns I have is that . . . . She couches the assessment that she provided as according to . . . the patient. And that's . . . something that is of concern to me because it's not based on her opinion. It's based on . . . what the assessment is.").

The ALJ's reason—inconsistency with the record as a whole—is a permissible justification for giving less than controlling weight to the opinion of a treating physician. See Arruda, 314 F. Supp. 2d at 72. As an initial matter, the ALJ could properly discount Dr. Barkalow's 2012 assessment because she relied on the claimant, rather than on objective medical testing. See D.A. v. Colvin, No. 11-40216-TSH, 2013 U.S. Dist. LEXIS 140791, at *22 (D. Mass. Sept. 30, 2013) (finding that the ALJ gave a "rational explanation" for favoring the state medical examiners, because the examiners relied on "objective medical evidence in the record, and not on D.A.'s self reporting about his limitations"); Colon v. Astrue, No. 11-30078-GAO, 2012 U.S. Dist. LEXIS 133533, at *12 (D. Mass. Sept. 19, 2012) ("Here, the ALJ assigned little weight to Dr. Bloomberg's opinion because many of his findings were based on the plaintiff's claims, not on medical signs or laboratory findings. . . . Such judgments are primarily the

responsibility of the ALJ. "").  Credibility determinations lie with the ALJ, and to the extent the

ALJ found that the twelve areas of marked limitation were controverted by the record, he acted

properly in assigning them only some weight.  See Rodriguez, 647 F.2d at 222.

Next, substantial evidence supports the ALJ's determination that the severity of Gosse's

disability is inconsistent with the "marked" limitations Dr. Barkalow described.  First, Gosse

does not assert the ALJ erred in its determination that Dr. Barkalow's reports were inconsistent

with the record, or even that the record showed that Gosse was disabled; rather, Gosse's

argument is that had the ALJ given Dr. Barkalow's reports full weight, he would have decided

differently.  Thus, Gosse tacitly acknowledges the differing nature of Dr. Barkalow's reports

from the rest of the record.

Second, Dr. Barkalow's report is inconsistent with the record in a number of places.  For

example, Dr. Barkalow writes that "Mr. Gosse has shown major difficulty in his ability to take

care of his basic needs – eating, shopping, sleeping, physical safety. . ." A.R. at 1111.

Nevertheless, Gosse testified during his hearing that he drove and went shopping.  Id. at 70, 82-

84.  In functional assessments from September 2011 and February 2012, Gosse reported needing

no help with housekeeping/laundry, grocery shopping/light food preparation, personal care skills,

exercise, transportation or time management.  Id. 292-98, 853.

Moreover, Dr. Barkalow found Gosse markedly limited in his ability to get along with

coworkers or peers without exhibiting behavioral extremes.  Nevertheless, the record shows that

Gosse had friends, girlfriends, and intimate relationships during this period.  Id. at 84-85, 101-

102, 455, 806, 1012.  While Gosse's conditions were being treated, the record indicates that he

experienced greatly reduced anxiety, and was even social.  Id. at 1020.  More, Dr. Phillips found

Gosse only moderately limited in his evaluation.  Id. at 888.

Gosse was also markedly limited, according to Dr. Barkalow, in his ability to perform activities within a schedule and maintain regular attendance.  Id. at 1108.  Nevertheless, according to Gosse's own testimony, he visits his treatment center five days a week, from 9 to 3, and only misses a few days per month.[6]  Id. at 78, 81. Dr. Phillips' report, showing Gosse as moderately limited, is consistent with this testimony.  Id. at 887.

Dr. Barkalow found Gosse further limited with his ability to ask simple questions or request assistance.  Id. at 1109.  Nonetheless, Gosse frequently initiated his own medical care and managed his treatment in terms of what counseling and medication was acceptable to him.  Id. at 753-755, 782.  Dr. Phillips' report, which shows Gosse as not significantly limited in this capacity, is consistent with the record.  Id. at 888.

Finally, Dr. Barkalow found Gosse markedly limited in his ability to set realistic goals or make plans independently of others.  Id. at 1109.  Nevertheless, Gosse testified that he can take care of himself, participates in his own hobbies, and applies lessons used in the day program to diminish his anxiety.  Id. at 81-82.  Once more, Dr. Phillips' report, which shows Gosse as not significantly limited in this capacity, is consistent with the record.  Id. at 888.

The ALJ recognized that Gosse "has some limitations due to his impairments."  Id. at 55.  The determination of these impairments' severity, however, is an issue properly assigned to the ALJ.  See Lovern v. Astrue, No. 09-40098-TSH, 2011 U.S. Dist. LEXIS 113033, at *29 (D. Mass. Sept. 29, 2011) (finding that the "ALJ is charged with weighing conflicting evidence and does not necessarily need to give more weight to the opinion to a treating professional" regarding the severity of a claimant's impairments); see also Dionne v. Heckler, 585 F. Supp. 1055, 1058

---

[6] While Gosse later said he misses 4-5 days per month, A.R. at 101, this is a finding of fact for the ALJ.

(D. Me. 1984) ("Since it is well within the ALJ's province to determine the weight to be given to conflicting medical testimony . . . and since the evidence of the severity of Plaintiff's colitis was not overwhelmingly conclusive, the ALJ could properly have determined that Plaintiff's colitis was not severe.").  This Court finds that the ALJ's analysis of the record—that it shows moderate limitations and not the marked limitations Dr. Barkalow outlined—is supported by substantial evidence.  Substantial evidence also supports the ALJ's decision not to give controlling weight to those portions of Dr. Barkalow's opinions which were inconsistent with the record as a whole.

IV.    CONCLUSION

For the reasons set forth above, the Court ALLOWS the Commissioner's Motion to Affirm, Doc. No. 26, and DENIES Gosse's Motion to Reverse or Remand. Doc. No. 18.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge